UNITED STATES of America

v.

Luis A. MURGAS, a/k/a Big Louie, a/k/a/ Barosa; Luis E. Cordoba–Murgas, a/k/a/ Negro, a/k/a Carlos; Luis Antonio Todd–Murgas, a/k/a Little Louie; Cesar A. Todd–Murgas, a/k/a Tony, a/k/a Pepita; Raul Antonio Cordoba–Murgas, a/k/a Strawberry; Ruben A. Todd–Murgas; Vincente Rogers, a/k/a Santos; Gilberto Arce, a/k/a Luigi Santiago; Jayson Jones; Dennis J. Calandra, Jr.; Tiffany Gaudinot; Tricia Irving, Defendants.

No. 95–CR–384.

United States District Court,
N.D. New York.

Dec. 15, 1998.

Thomas J. Maroney, Syracuse, New York, for the Northern Dist. N.Y. (Grant Jaquith, Assistant U.S. Attorney, of counsel), for U.S.

Calvin J. Domenico, Jr., Rome, New York, for defendant Luis E. Cordoba–Murgas.

William M. Borrill, Whitesboro, New York, for defendant Luis Antonio Todd–Murgas.

Robert G. Wells, Syracuse, New York, for defendant Raul Antonio Cordoba–Murgas.

## MEMORANDUM–DECISION & ORDER

MUNSON, Senior District Judge.

Defendants Raul Antonio Cordoba–Murgas ("Raul Cordoba"), Luis E. Cordoba–Murgas ("Luis Cordoba") and Luis Todd–Murgas ("Luis Todd") have motions before this court opposing the government from seeking an upward departure in their sentencings.[1] The government, which opposes defendants' motions, seeks a sentencing enhancement for defendants based upon their alleged involvement in a double homicide. The government contends that on January 12, 1995, Luis Cordoba directed Raul Cordoba and Luis Todd to collect a drug debt from Jason Jacobs and that in the course of these drug collection efforts, Raul Cordoba shot and killed Jacobs and his girlfriend, Kelly Coss. Defendants never have been charged with the double murder, but the government asserts their base offense levels should be enhanced as a result of their alleged responsibility.

The court reserved upon defendants' motions following oral argument and, in the interim, held a sentencing hearing at which the government and defendants' introduced evidence regarding the government's sentencing request. The court now examines the merits of the parties' arguments.

### BACKGROUND

From 1991 until their arrest in March 1996, defendants represented the inner circle of a drug enterprise to distribute large quantities of powder and crack cocaine in Rome, New York, and the surrounding Oneida County area. *See generally United States v.*

---

1. By letters authored by their counsel dated June 26 and June 29, 1998, respectively, Luis Cordoba and Luis Todd inform the court that they join in Raul Cordoba's motion to preclude upward departure.

*Murgas,* 177 F.R.D. 97, 102 (N.D.N.Y.1998) (for a comprehensive factual recitation relating to the conspiracy's criminal activity). This drug enterprise was not a small-level operation: it regularly distributed large quantities of cocaine, sometimes by kilograms.

In the latter days of the drug enterprise, Luis Cordoba became its leader, taking over for his jailed uncle, Luis A. Murgas. Under Luis Cordoba's leadership, the enterprise paid defendant Jayson Jones, who it had recruited at the age of fourteen, to transport cocaine from New York City to Rome, New York. Occasionally, Luis Cordoba and Raul Cordoba traveled with Jones to New York City to acquire the cocaine. After obtaining the cocaine in New York City, Jones would return to Oneida County, either by bus or train, where he also stored cocaine for the enterprise. When a distributor in the enterprise needed cocaine for a transaction, he obtained it from Jones.

As the enterprise's drug activity increased, so did surveillance by the government. On several occasions, court-authorized wiretaps were placed on the telephones of numerous conspirators, including Luis Cordoba's. As a result, the government intercepted sundry conversations, many of which detailed illicit transactions involving both regular customers and undercover agents. Based upon a surfeit of evidence, on March 8, 1996, the government executed search warrants at the residences of several conspirators and arrested the defendants.[2]

On March 21, 1996, a Grand Jury charged defendants in an eight-count second superseding indictment. Before trial, Luis Cordoba and Luis Todd pled guilty to the second count of the indictment, which charged them and eleven others with engaging in a conspiracy with the intent to distrib-

ute and distribution of powder and crack cocaine in violation of 21 U.S.C. § 846. Luis Cordoba also pled guilty to the charge of "knowingly and intentionally possess[ing] with the intent to distribute and distribut[ing] cocaine" in violation of 21 U.S.C. § 841(a)(1). By jury verdict entered on June 26, 1997, Raul Cordoba was convicted of participating in the drug conspiracy charged in the second count.

Through their drug enterprise, defendants were responsible for trafficking between fifteen and fifty kilograms of cocaine. Under the United States Sentencing Guidelines, their base offense level for this conduct is thirty-four. *See* U.S.S.G. § 2D1.1(c). Pursuant to U.S.S.G. § 2D1.2(a)(2), Luis Cordoba's base offense level is enhanced one level to thirty-five because his offense involved a minor. His base offense level is enhanced four more levels to thirty-nine because he was an organizer or leader of criminal activity that involved five or more participants. *See* U.S.S.G. § 3B1.1(a). Absent any other adjustments, including the enhancements the government seeks, the Guidelines manual recommends as follows: (1) Raul Cordoba, with a criminal history category of one and a base offense level of thirty-four, faces 151 to 188 months imprisonment; (2) Luis Todd, with a criminal history category of three and a base offense level of thirty-four, faces 188 to 235 months imprisonment; and (3) Luis Cordoba, with a criminal history category of one and a base offense level of thirty-nine, faces 262 to 327 months imprisonment.

Notwithstanding defendants' prospects for lengthy incarceration, the government charges that Raul Cordoba's base offense level should be forty-three, pursuant to United States Sentencing Guidelines §§ 2D1.1(d)(1) and 2A1.1.[3] Section 2D1.1(d)(1) provides:

---

**2.** The items seized included $24,850 in United States currency from Luis Cordoba. *See Murgas,* 177 F.R.D. at 105. Included in the seized currency were "official government" funds previously paid by undercover government agents to members of the conspiracy for cocaine. In addition, large quantities of powder cocaine were seized at the residence of Jayson Jones.

**3.** In addition, the government asserts that Raul Cordoba should receive an increase of two levels

pursuant to U.S.S.G. § 2D1.1(b)(1). Section 2D1.1(b)(1) provides that "[i]f a dangerous weapon (including a firearm) was possessed, increase by 2 levels." The government also asserts that Raul Cordoba should receive an increase of one level pursuant to U.S.S.G. § 2D1.2(a)(2) which provides, in pertinent part, that the base offense level for drug offenses involving an underage person shall be "1 plus offense level from

[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder).

The base offense level of forty-three under § 2A1.1 represents life imprisonment for a defendant.

As to Luis Cordoba and Luis Todd, the government asserts their base offense level should be determined pursuant to U.S.S.G. § 5K2.1,[4] which states that "[i]f death resulted, the court may increase the sentence above the authorized guideline range." Should the court grant the government's request, these defendants almost certainly would face life imprisonment given their respective base offense levels and criminal history categories.

Defendants oppose any upward departures at their sentencing, arguing these enhancements: (1) are being applied selectively to only three of several co-defendants; (2) violate the Eighth Amendment, which prohibits cruel and unusual punishment; (3) violate the Constitution through introduction of otherwise inadmissible hearsay evidence and the denial of the right to confrontation of witnesses; (4) violate their constitutional rights to indictment, trial by jury, and all other constitutional rights afforded to individuals charged with crimes; and finally, (5) violate the Constitution through fundamental unfairness and substantive and procedural due process. Alternatively, should these arguments fail, defendants request the court to establish at least a "clear and convincing" standard as the burden of proof the government must sustain. The government counters that substantial precedent proves its enhancement requests are constitutional and argues that it need only demonstrate defendants' involvement in the murders by a "preponderance of the evidence" standard. The court addresses these arguments *seriatim.*

§ 2D1.1 applicable to the total quantity of controlled substances involved in the offense."

## DISCUSSION

## I. Defendants' Motions to Preclude an Upward Departure

### A. Selectivity of Application

Defendants arguing that an upward departure operates selectively to sentence them to harsher penalties while other co-defendants convicted of the same drug offenses at trial are not subjected to the same enhancements. They do not submit authority directly supporting their contention, but instead refer the court to "selective prosecution" cases, which they argue must apply by analogy.

In the context of these cases, it is well-settled that the government retains "broad discretion" as to whom to prosecute and, as such, mere selectivity in prosecution creates no constitutional problem. *See, e.g., Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985). Though prosecutorial discretion is broad, selection may not be based deliberately on an unjustifiable standard, such as race, religion, or other arbitrary classification. *See Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962). If defendants instant argument is to succeed, they must prove that the government's choice to seek an upward departure against them: (1) had a discriminatory effect; and (2) was motivated by a discriminatory purpose. *See Wayte,* 470 U.S. at 608, 105 S.Ct. at 1531.

Defendants' "selective sentencing" argument need not detain the court for long. As noted above, defendants' argument relates to the issue of selective sentencing, not selective prosecution. Notwithstanding the inapposite case law, defendants fail to show that the government's decision to move for an upward departure at sentencing was motivated by a discriminatory purpose. In fact, during oral argument, defendants conceded there is neither direct nor circumstantial evidence that the government is motivated by discrimination. Indeed, the government alleges that Raul Cordoba, Luis Cordoba and

4. If the base offense level for Raul Cordoba is not deemed to be forty-three, the government moves for an upward departure for him pursuant to U.S.S.G. § 5K2.1.

Luis Todd are subject to the sentence enhancements because they—and not other defendants in this matter—were involved in the murders of Jason Jacobs and Kelly Coss. Absent a showing that the government has discriminated in selecting these defendants for sentencing enhancements, defendants' argument must fail: their instant claim is without merit.

### B. Cruel and Unusual Punishment under the Eighth Amendment

■ Relying upon *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), defendants argue that as the requested enhancements are disproportionate to the crime for which they have been convicted, the enhancements sought violate the Eighth Amendment's proscription against cruel and unusual punishments. In *Weems* the Supreme Court held that a defendant's fifteen year sentence of "cadena punishment"[5] for falsifying a public document violated the Eighth Amendment's prohibition of cruel and unusual punishment. 217 U.S. at 367, 30 S.Ct. at 547. Defendants also cite *Solem v. Helm*, in which the Supreme Court set aside a defendant's life sentence without the possibility of parole because it was disproportionate to the crime committed in violation of the Eighth Amendment.[6] 463 U.S.

277, 281, 103 S.Ct. 3001, 3003 77 L.Ed.2d 637 (1983). The obvious distinction between *Weems, Solem* and the instant case is that the crimes proven and alleged herein are "very serious offenses," not "relatively minor" ones.

■ The Eighth Amendment provides that "excessive bail shall not be required, nor any excessive fines imposed, nor cruel and unusual punishments inflicted." The United States Supreme Court has observed that the Eighth Amendment prohibits imposition of a sentence that is "grossly disproportionate to the severity of the crime."[7] *Rummel*, 445 U.S. at 271, 100 S.Ct. at 1138. Indeed, the Second Circuit has stated that the "Eighth Amendment condemns only punishment that shocks the collective conscience of society." *United States v. Gonzalez*, 922 F.2d 1044, 1053 (2d Cir.1991). Although the excessiveness of one prison term as compared to another is invariably a subjective determination, *Rummel*, 445 U.S. at 275, 100 S.Ct. at 1140, courts regularly have rejected Eighth Amendment challenges to sentences in circumstances more compelling than those presented here. *See Harmelin*, 501 U.S. at 996, 111 S.Ct. at 2702 (allowing life without parole for possession of 672 grams of cocaine); *Rummel*, 445 U.S. at 285, 100 S.Ct. at 1145 (permitting life sentence under state recidi-

---

**5.** In *Weems*, the Court defined "cadena punishment" as punishment that called for incarceration at "hard and painful labor," with chains fastened to the wrists and ankles at all times. 217 U.S. at 364, 30 S.Ct. at 544. Additional "accessories" were added, including permanent disqualification from holding any position of public trust, subjection to government surveillance for life and deprivation of rights of parental authority, guardianship of person or property, etc. *Id.* Though the Court found this to be a "grossly disproportionate punishment" for the crime defendant committed, it has more recently noted in *Rummel v. Estelle*, 445 U.S. 263, 274, 100 S.Ct. 1133, 1139, 63 L.Ed.2d 382 (1980), that defendant's length of sentence in *Weems* did not serve as the only factor for the Court's decision. Rather, the Court found that *Weems* could not be applied without regard to its "peculiar facts" relating to the triviality of the charged offense and the extraordinary nature of the "accessories" included within the punishment of "cadena punishment." *Id.*

**6.** In *Solem*, defendant was convicted with uttering a "no account" check for $100, carrying a

maximum punishment of five years. 463 U.S. at 281, 103 S.Ct. at 3001. However, defendant was sentenced to life imprisonment without parole under a South Dakota recidivist statute for successive offenses that included three convictions for third-degree burglary, one for obtaining money by false pretenses, one for grand larceny and one third-offense driving while intoxicated. *Id.* Notably, the Court explained that defendant's felonies were all "relatively minor" and "nonviolent," posing no threat of harm to any person. *Id.* at 296–97, 103 S.Ct. 3001.

**7.** Although the Supreme Court has acknowledged that the severity of a sentence may be reviewable in extreme circumstances, for example, "if a legislature made overtime parking a felony punishable by life imprisonment," *Rummel*, 445 U.S. at 274, n. 11, 100 S.Ct. at 1139, n. 11, the exception is a narrow one, and though "one can imagine extreme examples that no rational person, in no time or place, could accept," such examples are easy to decide because "they are certain never to occur." *Harmelin v. Michigan*, 501 U.S. 957, 996, 111 S.Ct. 2680, 2702, 115 L.Ed.2d 836 (1991).

vist statute, where the three predicate offenses were fraudulently using a credit card to obtain $80 worth of goods, passing a forged check in the amount of $28.36, and obtaining $120.75 by false pretenses); *United States v. Valdez,* 16 F.3d 1324, 1334 (2d Cir.1994) (life without parole for "merely middle-level drug dealers").

Against this backdrop, the court finds that the sentence enhancements the government seeks are not disproportionate to defendants' drug convictions. Although the punishment of life imprisonment undoubtedly is harsh, defendants were accountable for the trafficking fifteen to fifty kilograms of cocaine during their involvement in the drug enterprise. Such conduct alone warrants a considerable period of incarceration. Moreover, the government seeks the upward departure in these defendants' sentencing because of their alleged involvement in two homicides committed during the course of their drug enterprise. It is clear to the court that drug possession and distribution pose a serious threat to the health and general welfare of society. As such, defendants' suggestion at oral argument that their crimes were "nonviolent" and perhaps "victimless" is *ad absurdum;* and in light of *Harmelin,* there is little question that a sentence of life imprisonment without the possibility of parole for drug offenses as serious as those committed by defendants does not constitute "cruel and unusual punishment." Defendants' Eighth Amendment claim fails.

### C. Admissibility of Hearsay Evidence

Defendants move to preclude the government from seeking an upward departure at sentencing upon the ground that it violates the United States Constitution through the introduction of otherwise inadmissible hearsay evidence. Defendants do not submit authority to support this argument, but merely plead that the court must foreclose the admissibility of hearsay "in a matter of this magnitude and gravity ... under severely reduced and liberalized standards for the prosecution." Affidavit of Robert G. Wells, dated June 22, 1998 at ¶ 18. The court appreciates the gravity of defendants' situation, but it is well-settled that the rules of evidence do not apply to sentencing proceedings. *See* Fed.R.Evid. 1101(d)(3).

In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial. Title 18 U.S.C. § 3661 provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Under U.S.S.G. § 6A1.3:

> "[i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indices of reliability to support its probable accuracy."

It also is well-settled that the requirements of due process in relation to evidence received during a sentencing proceeding do not correspond to the requirements of due process at the trial stage. *See Williams v. New York,* 337 U.S. 241, 251, 69 S.Ct. 1079, 1085, 93 L.Ed. 1337 (1949). Accordingly, a sentencing judge may consider hearsay statements, evidence of uncharged crimes, dropped counts of an indictment and even alleged criminal activity resulting in an acquittal in determining sentencing. *See United States v. Pugliese,* 805 F.2d 1117, 1122 (2d Cir.1986); *see also United States v. Sweig,* 454 F.2d 181, 183–84 (2d Cir.1972). As long as the information which the sentencing judge considers has sufficient indicia of reliability to support its probable accuracy, the information may properly be taken into account in passing sentence. *See United States v. Watts,* 519 U.S. 148, 117 S.Ct. 633, 637, 136 L.Ed.2d 554 (1997); *see also Nichols v. United States,* 511 U.S. 738, 114 S.Ct. 1921, 1928, 128 L.Ed.2d 745 (1994). Defendants' claim as to the inadmissibility of hearsay evidence is without merit.

### D. Indictment and Trial by Jury

Defendants submit the sentencing guidelines applicable in this case are unconstitutional because they deprive defendants of

their right to a jury trial. Defendants dispute that the court may use their "relevant conduct" for purposes of setting the sentence: *e.g.,* functionally sentencing them for conduct with which they never have been charged, let alone indicted or convicted. In sum, defendants maintain that the government cannot proceed with an upward departure at sentencing for murder because such a departure would violate their constitutional rights to indictment, trial by jury, and other constitutional rights afforded to individuals charged with this crime.

Were the defendants charged with murder, their concerns would be valid. Although defendants unquestionably would be afforded the rights they seek were they to be tried for murder, the Supreme Court has made it "abundantly clear that a defendant does not enjoy a constitutional right to a jury determination as to the appropriate sentence to be imposed." *Libretti v. United States,* 516 U.S. 29, 49, 116 S.Ct. 356, 368, 133 L.Ed.2d 271 (1995). *See also McMillan v. Pennsylvania,* 477 U.S. 79, 93, 106 S.Ct. 2411, 2420, 91 L.Ed.2d 67 (1986) ("there is no Sixth Amendment right to jury sentencing, even where the sentence turns on specific findings of fact"). Under factual circumstances similar to this matter, other circuit courts have rejected similar constitutional claims by defendants.[8]

Simply put, courts examining defendants' instant argument have found it is misplaced. The government is not trying to convict defendants for murder, but instead requests the court to consider defendants' alleged involvement in the 1995 homicides as "relevant conduct" to justify a harsher sentencing for defendants. The government's approach is not novel and was endorsed by the Supreme Court in *Watts,* 519 U.S. at ——, 117 S.Ct. at 636, when it explained that taking into ac-

count conduct related to the offense of conviction in sentencing is not the identical to holding the defendant criminally culpable for that conduct. *Id.* Moreover, defendants' drug conspiracy conviction subjects them to a maximum penalty of life imprisonment, so their conviction "supplies all of the justification the Constitution requires for depriving [them] of liberty for any term up to the maximum prescribed by statute." *United States v. Masters,* 978 F.2d 281, 286 (7th Cir.1992). Defendants' instant claim must fail.

### E. Fundamental Unfairness and Due Process

It is true that some might question the fairness of a process that allows defendants' sentences to be adjusted upward for murder when they were never charged with, tried for, or convicted of that crime. *See generally* Elizabeth T. Lear, *Is Conviction Irrelevant?* 40 UCLA L.REV. 1179 (1993). However, given the disposition of defendants' aforementioned claims, and the holdings in our sister Circuits, the court finds this final claim must fail. Accordingly, defendants' motions to preclude the government from seeking an upward departure in their sentencings are **DENIED.**

### II. Burden of Proof

Given that the government is permitted to seek an upward departure in defendants' sentencings, the court must determine which standard of proof governs the sentencing hearing regarding the upward departure. Defendants request a higher standard of proof at sentencing because they contend that the sentencing enhancements sought present the real possibility that they would face life sentences.[9] They allege their sen-

---

8. *See United States v. Crump,* 120 F.3d 462, 468 (4th Cir.1997) (finding no constitutional violation under the sentencing guidelines in district judge's enhancement of defendant's sentence for a drug conspiracy conviction to life imprisonment in light of testimony that defendant shot victim during robbery); *United States v. Harris,* 932 F.2d 1529, 1539 (5th Cir.1991) (holding defendant's sentence for firearms offense properly was enhanced to life sentence under guidelines applying more specific guideline section applicable to murder, based on the finding that defen-

dant committed murder during the course of related drug conspiracy); *United States v. Meyer,* 157 F.3d 1067, 1082 (7th Cir.1998) (consideration of defendant's alleged participation in murders as "relevant conduct" in sentencing him for drug conspiracy under Sentencing Guidelines did not violate due process, even though defendant was not tried for or convicted of murders).

9. Raul Cordoba is thirty years old and facing a term of 151 to 188 months incarceration. While it is impossible to predict the future, it is not

tencing hearing functions as "a tail which wags the dog of the substantive offense," *McMillan*, 477 U.S. at 88, 106 S.Ct. at 2417, and contend their involvement in the homicides must be established beyond a reasonable doubt, or at least by clear and convincing evidence. The government responds that the law of this Circuit mandates a preponderance of the evidence standard.

 The government is correct in that Second Circuit has held repeatedly that "disputed facts relevant to sentencing, even under the Guidelines, need be established only by a preponderance of the evidence." *United States v. Concepcion*, 983 F.2d 369, 388 (2d Cir.1992), *cert. denied*, 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993); *United States v. Rodriguez–Gonzalez*, 899 F.2d 177, 182 (2d Cir.), *cert. denied*, 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990); *United States v. Guerra*, 888 F.2d 247, 251 (2d Cir. 1989) (preponderance standard applies to findings of relevant conduct), *cert. denied*, 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990). Yet, in addressing defendants' concerns not long ago, then Chief Judge Newman noted:

> A guideline system that prescribes punishment for unconvicted conduct at the same level of severity as convicted conduct obviously obliges courts to proceed carefully in determining the standards for establishing whether the relevant conduct has been proven. We have recognized the need for such care with regard to the basic issue of

the degree of the burden of proof. Thus, though the Sentencing Commission has favored the preponderance-of-the-evidence standard for resolving all disputed fact issues at sentencing, U.S.S.G. § 6A1.3., p.s., comment., *we have ruled that a more rigorous standard should be used in determining disputed aspects of relevant conduct where such conduct, if proven, will significantly enhance a sentence. See United States v. Gigante*, 94 F.3d 53, 56–57 (2d Cir.1996) (denying petition for rehearing).

*United States v. Shonubi*, 103 F.3d 1085, 1089 (2d Cir.1997) (emphasis supplied).[10]

 In *Shonubi*, where the Circuit decided to apply a higher standard than preponderance of the evidence, the relevant conduct determination represented a departure of from 78 to 97 months incarceration to 151 to 188 months incarceration. *See* 103 F.3d at 1087–90.[11] In this matter, as addressed *infra*, the putative departure in sentencing is dramatic: each defendant could receive a term of life imprisonment, or a term of additional months virtually assuring life imprisonment. In light of *Shonubi*, and given the dramatic impact of the departure sought, the court opts to apply a heightened burden of proof in the sentencing hearing.[12]

 Which burden of proof should apply requires some examination. At the outset, the court refuses defendants' request to apply a beyond a reasonable doubt standard.

> The court notes that both *Gigante* and *Ruggiero* preceded *Shonubi*, and also that *Shonubi* cites *Gigante* as precedent for its decision to apply a higher standard of proof.

inconceivable that if he should he face a term of life imprisonment, as the government proposes, his potential sentence could increase by 200 to 300 months: *e.g.*, at aged sixty, he will have spent roughly 360 months in prison; at aged seventy, he will have spent about 480 months in prison. The point the court makes is simply that the potential difference defendants face in sentencing is dramatic.

10. *See also United States v. Gamez*, 1 F.Supp.2d 176, 182 (E.D.N.Y.1998) (Weinstein, J.).

11. *But see Gigante*, 94 F.3d at 55 (following numerous adjustments and departures based in part on acquitted conduct, defendants originally facing sentencing range of 27 to 33 months were sentenced to 188 and 200 months, respectively); *see also United States v. Ruggiero*, 100 F.3d 284, 291 (2d Cir.1996) (reaffirming holding in *Gigante*).

12. The court realizes that the departure sought for Luis Cordoba would not be as great as that of his co-defendants'—*i.e.*, as he already is facing a term of 262 to 327 months imprisonment, an upward departure of 360 months to life arguably might not invoke the need for use of a higher burden of proof. It would be incongruous and extraordinarily difficult to apply a lesser burden of proof to demonstrate his involvement in the homicides while applying a more rigid standard of proof to his co-defendants. The court applies the heightened burden of proof to all the defendants.

A defendant at sentencing does not have a right to have his sentence determination confined to facts proven beyond a reasonable doubt. *McMillan*, 477 U.S. at 92, 106 S.Ct. at 2419. In *Shonubi*, a drug case in which the issue was the quantity of cocaine trafficked relative to the defendant's base offense level, the court "invoked the rule from prior case law that ... 'uniformly requires *specific evidence*—e.g., drug records, admissions or live testimony—to calculate drug quantities for sentencing purposes.'" 103 F.3d at 1089 (emphasis in original). Obviously, the "specific evidence" standard is not analogous to this matter. In *Gamez*, although the court notes the Second Circuit "requires a somewhat heavier standard than a preponderance of the evidence at sentencing when the issue in dispute could substantially enhance the Guidelines penalty," the court does not articulate what that "somewhat heavier standard" is. 1 F.Supp.2d at 182. It appears there is no other case in this Circuit addressing which heightened burden of proof might apply, which necessarily leaves the task in this court's hands.

Logically, unless the court should create a new standard, which it chooses not to do, the burden of proof that must apply here is the "clear and convincing" standard. *See, e.g., United States v. Kikumura*, 918 F.2d 1084, 1100–02 (3d Cir.1990) (applying clear and convincing standard at sentencing hearing where dramatic upward departure was sought); *United States v. Townley*, 929 F.2d 365, 370 (acknowledging in dicta that clear and convincing standard might apply in "exceptional case"); *United States v. Restrepo*, 946 F.2d 654, 661 n. 12 (9th Cir.1991) (acknowledging situations posed in *Kikumura* and *Townley* posed scenarios "that threatened an unacceptable sentencing effect under only a preponderance of the evidence standard"). As defined by Black's Law Dictionary, Third Edition, clear and convincing evidence is "that quantum of evidence beyond a mere preponderance, but below that of 'beyond a reasonable doubt' ... and as such that it will produce in the mind of the

trier of fact a firm belief as to the facts sought to be established."

### III. The Sufficiency of the Evidence Adduced at the Defendants' Sentencing Hearing

Based upon the evidence adduced at the hearing and the exhibits stipulated to by the parties, it is clear Jason Jacobs not only was a regular customer of defendants' drug enterprise, but also himself sold cocaine. Jacobs originally bought cocaine from Dave Hopkins, but because he felt Hopkins "was cutting his cocaine too much and his cocaine was getting bad," he opted to deal with Hopkins' supplier, Raul Cordoba, a/k/a "Strawberry," in the six to eight months preceding his death. Gov't Ex. 42, "Supporting Dep. of Robert A. Preston," at 3–4. *See also* Gov't Ex. 31, "Supporting Deposition of Michael Richard Thomas Bernier," at 1; Gov't Ex. 33, "Supporting Deposition of Peter R. Drummond," at 1. Raul Cordoba sometimes fronted Jacobs cocaine and roughly three weeks before Jacobs' death, Raul Cordoba fronted him two ounces.[13] Gov't. Ex. 33 at 1. On January 6, 1995, about a week before his death, Jacobs confided to a friend, Robert Preston, that he owed $2600 to defendants but had only $1500. Gov't Ex. 42 at 4. According to Sheri Lynn LaGreco–Hoy, however, when Raul Cordoba stopped by the convenience store where she worked as cashier roughly two weeks after the murders, he told her that Jacobs "had paid him off two weeks before he died." Gov't Ex. 37, "Supporting Deposition of Sheri Lynn LaGreco–Hoy," at 2. Clearly Jacobs' statement to Preston belies Raul Cordoba's purported claim that Jacobs owed him no money. Indeed, according to the testimony of Valerie Muscarella, at a party on January 11, 1995, the night before he and Coss were killed, Jacobs complained "that he had to[o] much cocaine fronted out to people that [were] not paying him for the cocaine." Gov't Ex. 39, "Supporting Deposition of Valerie Muscarella," at 2.[14] *Id.* It appears very likely that on

---

**13.** One witness testified that Raul Cordoba charged Jacobs $1100 per ounce of cocaine, while another said he charged $1300 per ounce. *See* Gov't Ex. 33 at 1; Gov't Ex. 42 at 4.

**14.** Muscarella also testified that on January 13, 1995, after she heard that Jacobs and Coss had been killed, she telephoned Heather Burth, who worked with Coss. Muscarella states Burth told

the day he and Coss were killed, Jacobs owed defendants drug money.

On January 12, 1998, Jacobs arrived at 11:00 am at the Fisher Auto Parts store, where he worked. The store, located on 726 Erie Boulevard West in Rome, New York, was to close that evening at 8:00 pm. Gov't Ex. 43, "Supporting Deposition of Wendy Coonradt," at 1.[15] At 7:30 pm, Jacobs telephoned Coss at Pizza Hut, where she worked, to order a pizza. Gov't Ex. 45. At approximately 7:50, Coss, borrowing coworker Heather Burch's car, left to deliver the pizza to Jacobs. Gov't Ex. 44; Gov't Ex. 47, "Supporting Deposition of Heather Burch." At 8:00 pm, Peter Drummond called Jacobs to buy marijuana. Drummond estimates the call took five minutes and notes Jacobs was acting "kind of odd." Gov't Ex. 33 at 2. At 8:09 pm, Jacobs began to print the cash register's invoice. Gov't Ex. 49, "Supporting Deposition of Edward D. Fisher." Jacobs made his last entry at 8:12 pm. Other routine computer procedures done to close the store were not performed that evening. _Id._

At 8:15 pm, Robert J. Johnson called Fisher Auto Parts store to speak with Jacobs, but no one answered. Gov't Ex. 50, "Supporting Deposition of Robert J. Johnson," at 2.[16] Coss had not returned with her car, so Burth called Fisher Auto Parts store at 9:15 pm and 10:10 pm, but again no one answered the phone. At 10:30 pm, Burth and Carmen Pezzula, her co-worker at Pizza Hut, drove to the store. The door was unlocked and they entered. They discovered Coss lying dead on the floor in an aisle next to the checkout

counter, and Jacobs lying dead on the floor next to the counter. Gov't Ex. 47; Gov't Ex. 46, "Supporting Deposition of Carmen Pezzula," at 1. Upon discovering the bodies, they left the store and called the police. _Id._

Jacobs and Coss had been shot by a .25 caliber gun, which has never been found. Jacobs was found dead on his back behind the store counter, while Coss was found face down in front of the counter. The cash register was empty, except for a dime. The pizza Coss had brought Jacobs was still in its box, uneaten and on the counter. A few latent prints were lifted from the scene, but aside from a print identified as Jacobs', no other prints were identified.

The government theorizes that Raul Cordoba killed Jacobs and Coss. It contends: Luis Cordoba sent Raul Cordoba and Luis Todd to Fisher Auto Parts Store that evening to collect money that Jacobs owed them. After the two arrived at the store, Cordoba argued with Jacobs that he wanted to take the drug debt from the store's register. While Cordoba argued with Jacobs, Coss walked into the store. Todd grabbed her. Cordoba shot both Jacobs and Coss. Cordoba and Todd took the store's money, drove to the Quality Inn motel in Rome, and threw the gun in the motel's dumpster.

In chief the government bases its case on circumstantial evidence, such as defendants' inconsistent alibis and supposed intimate knowledge of the crime, and the testimony of Michael Addison and Peter Russo. Addison, who lives on 714 Erie Boulevard West in Rome, which is nearby Fisher Auto Parts

---

her that Coss had confided that Jacobs owed $2000 to "Strawberry," yet it is difficult, without more, to place much value in this testimony. _Id._ For the reasons explained, _infra_, hearsay testimony is admissible when considering relevant conduct at a sentencing hearing. Nonetheless, though admissible, such testimony is problematic and Muscarella's testimony about Coss' statement to Burth maddeningly illustrates why: absent Burth's testimony, the court has no idea when Coss purportedly confessed the debt Jacobs owed to Raul Cordoba. Timing is germane here. It appears Cordoba fronted cocaine to Jacobs on several occasions; it appears Jacobs would repay him. It is not surprising, therefore, that at some point Jacobs would be in debt to Cordoba, so the question is _when_ did Coss claim Jacobs owed Cordoba $2000? A day prior to their deaths? A week? A month? Six months? If Coss had

made the statement to Burth just before their deaths, it would be probative. If she made the statement a month before, it would be less probative, and so forth.

15. Although Coonradt's supporting deposition states that the auto parts store was located at 726 Erie Boulevard, it does not indicate whether the road is Erie Boulevard West. The court called information and was informed that Erie Boulevard West is the correct street address for the store.

16. Johnson's girlfriend, who was with him when he made the call, claims Johnson called Jacobs at 8:21 pm. Gov't Ex. 51, "Supporting Deposition of Melissa D. Coleman," at 1.

store, testified that on January 12, 1995, he saw Raul Cordoba twice: the first time Cordoba and Eddie Hernandez drive by at dinnertime; the second time, which was later in the evening, while outside on his porch, he saw Cordoba get out of a car parked in a space between a John Deere dealership and a Harley Davidson shop on Erie Boulevard. He also testified that during a card game while he was at the Madison County Jail with Raul Cordoba and other defendants in September 1996, someone said, "you'll never get away with [murder]," to which Cordoba replied, "I already did."

Aside from his candor about his effusive use of marijuana, Addison's testimony is simply unreliable. Regarding his claim that he saw Raul Cordoba exit the car he saw park in the space between the John Deere dealership and the Harley Davidson shop, Addison testified: "Or I'm not even sure it was they; I think I only seen one person." Transcript of October 1, 1998 Sentencing Hearing, Testimony of Michael Addison at 12:1–3. Furthermore, Addison testified: (1) he was not "absolutely positive" and "[did not] remember the date" that he saw the car parked in the space, *id.* at 57:7–11; (2) he smoked considerable amounts of marijuana that day and admits he was high when he claims to have seen Raul Cordoba, *id.* at 27:14–16; 60:15–22; 71:4–9; (3) he could not identify what kind of car it was, or whether it was a two-door or a four door, because "it was dark," *id.* at 43:1–6; 46:21–22; (4) it could have been as late as 9:30 that he saw the car, *id.* at 42:15–17; (5) he never saw anyone from the parked car "go over to" the Fisher Auto Parts store, *id.* at 72:10–12. Defendants, moreover, produced Eric Lord, a private investigator, who testified that the distance from direct line of sight from Addison's vantage point on his porch to the spot where he claims to have seen Raul Cordoba is 384

feet. Lord also testified that an individual he met who worked in the business across the street from the Fisher Auto Parts store told him it was rainy, miserable and generally "dark as hell" the evening of the murders.[17] *See* Dfts' Ex. G. The court cannot credit Addison's testimony placing Raul Cordoba near the Fisher Auto Parts store on the evening of the murders: it is too dubious.

Nor can the court place sufficient credence in Addison's testimony regarding Raul Cordoba's alleged confession of murder. It was not established that Addison and Cordoba were incarcerated in the same facility contemporaneously. Richard Phillips, custodian of records at the Madison County Jail, testified that there was no evidence that Raul Cordoba had been in that facility when Addison was incarcerated there. Likewise, Elaine M. Egan, a custodian of records for the Onondaga County Justice Center, testified that Raul Cordoba had been no place else from October 1995 through October 21, 1998. Addison may have overheard the conversation he describes. Based upon the record, though, this court cannot credit his claim that it was Raul Cordoba—and not someone else—who made the ill-advised boast.

Other testimony the government produced was more probative. New York State Police Investigator Lyle Baxter, who interviewed Luis Todd on February 5, 1996, testified that although Todd professed innocence, he furnished details about the murder scene that had not been made public. Baxter testified that Todd knew the location of the bodies, where the wounds were, and that a .25 caliber gun had been used. According to Baxter, Todd stated that he heard Jacobs and Coss were shot in the back of the head with a .25 caliber handgun—but quickly stated that he heard it was either a .38, .25, or a .44 caliber handgun.[18] Baxter testified that none of this information had been made public.

---

17. Robert Masuchi, who testified for the government, claimed the measurement in question amounted to 297 feet. Although his measurement represents a difference of eighty-seven feet, it still amounts to nearly a football field in length: *e.g.*, a not inconsiderable distance in dark, rainy conditions.

18. Regarding the gun, Geoffrey Shulkin testified that Luis Todd told him he owned a .25 caliber

Raven, which was broken. Todd also had purchased a half of a box of .25 caliber cartridges from Shulkin. Gov't Ex. 91, "Grand Jury Testimony of Geoffrey Shulkin," at 13–14. Indeed, when Todd and his co-defendant's premises were searched on December 2, 1994, investigators found .25 caliber ammunition, but did not find a handgun.

He noted that Todd also stated the shootings were over drug money.

Defendants countered that although the police may not have made this information public, a good deal of information was printed in the local papers about the murders, including the fact that Jacobs and Coss were each shot once in the head. Dfts' Ex. I at 6. None of the papers discuss the caliber handgun used in the crime or the location of the bodies, but defendants' point that knowledge of the murder scene was not limited to the investigators is not without merit: aside from Burth and Pezzula, who discovered the bodies, paramedics visited the scene as did twenty recruits from the Oneida County Regional Training Center at Griffiss Air Force Base and the Mayor of Rome. *Id.* at 6–12. It is not inconceivable that Todd could have learned the details he discussed with Investigator Baxter from "talk on the street."

The strongest part of the government's case, however, is twofold: (1) defendants' lack of consistent alibis; and (2) Peter Russo's testimony. The court finds that defendants's alibis are inconsistent and need address this subject no further, suffice it to add that none of them can be accounted for at the likely time of the murders. Russo's testimony is a different matter. Russo met defendants when he was an inmate at the Madison County Jail. He testified that on January 12, 1997, two years after the murders, Luis Todd told him that he and Raul Cordoba went to the Fisher Auto Parts store to collect $3800 in drug money, but "things wound up pretty bad" and Jacobs and Coss "ended up getting shot." Specifically, Russo states Todd admitted that he and Raul Cordoba were arguing with Jacobs when Coss arrived. As Coss entered the store, Russo continues, Todd grabbed her. Raul Cordoba then shot them both, pushed Todd out the door, with the gun placed in a paper bag. The pair went to the Quality Inn, where they met Luis Cordoba. They disposed of the gun by throwing it in the motel's dumpster.[19]

The court acknowledges that Russo's long criminal history involves fraud, which gives it some pause when considering his testimony. However, given the fact that Russo was due to be released soon when he approached the government with his testimony, as well as the reasonable likelihood that he might face reprisal for testifying against defendants when he had so little to gain, and his demeanor on the stand, the court finds his testimony is more likely than not credible. Even coupled with defendants' inconsistent alibis, though, it does not quite produce in the court's mind a firm belief as to the facts sought to be established. In addition to Russo's criminal history, some details of his testimony trouble the court. First, the sum of $3800 is somewhat higher than the $2600 Preston states Jacobs claimed to have owed defendants. Second, Todd allegedly grabbed Coss as she walked through the door, yet the pizza box was placed neatly on the counter, which appears to be several feet from the door. *See* Gov't Exs. 3, 13–14, 20. It also appears that Coss may have been sitting on a stool near the counter where the pizza was placed when she was shot. *See* Gov't Exs. 13–16. Most important is the timing: if Coss was grabbed as she entered the store, it would have to have taken her at least twenty-two minutes to drive from Pizza Hut, which is located on 1127 Erie Boulevard West, to Fisher Auto Parts Store, which is located on 726 Erie Boulevard West. She left Pizza Hut at 7:50 pm and the last computer entry Jacobs made was at 8:12 pm. It simply seems more likely that if Coss was grabbed, she was already in the store, which would be inconsistent with Russo's testimony.

The government has cataloged some evidence that defendants were responsible for the January 12, 1995 homicides of Jason Jacobs and Kelly Coss, but it is not enough. The court finds the evidence the government has adduced does not demonstrate defendants committed these murders. This decision hardly exonerates defendants: it only holds the government has not demonstrated defendants' involvement by the more rigor-

---

**19.** If defendants did throw a gun in the motel's dumpster, it would be long gone. Robert Masuchi testified that the Quality Inn emptied its dumpster on January 14, 1995. The contents of the dumpster were taken to an energy recovery plant in Rome and incinerated. The weapon would have been reduced to ashes and hauled to a landfill.

ous clear and convincing standard. The government's request to set Raul Cordoba's base offense level at forty-three pursuant to U.S.S.G. §§ 2D1.1(d)(1) and 2A1.1 must be **DENIED.** The government's request for upward departures pursuant to U.S.S.G. § 5K2.1 for Luis Cordoba and Luis Todd, as well as its alternative request for a § 5K2.1 upward departure for Raul Cordoba, must be **DENIED** as well.

## CONCLUSION

For the foregoing reasons, the court **DENIES** defendants' motions to preclude the government from seeking an upward departure in the sentencing of Raul Cordoba, Luis Cordoba and Luis Todd. The government's request to set Raul Cordoba's base offense level at forty-three pursuant to U.S.S.G. §§ 2D1.1(d)(1) and 2A1.1 must be **DENIED.** The government's request for upward departures pursuant to U.S.S.G. § 5K2.1 for Luis Cordoba and Luis Todd, as well as its alternative request for a § 5K2.1 upward departure for Raul Cordoba, must be **DENIED** as well.

**IT IS SO ORDERED.**