**UNITED STATES of America,**

v.

**Young Ji CHUNG; Suck Ho Han, a/k/a Suk Ho Han, a/k/a Mr. Park, Defendants.**

**No. 98–CR–198.**

United States District Court, N.D. New York.

Oct. 13, 1999.

Hon. Daniel J. French, United States Attorney for the Northern District of New York, Syracuse, NY, for U.S.

Michael Vavonese, Syracuse, NY, for defendant Chung.

Paul G. Carey, Syracuse, New York, for defendant Han, of counsel.

## MEMORANDUM–DECISION & ORDER

MUNSON, Senior District Judge.

Currently before the court is the Government's motion for an upward departure for defendant Suck Ho Han ("Han"), as well as its requests for enhancements to Han's base offense level under the United States Sentencing Guidelines ("U.S.S.G."). Han opposes the requests and the motion. After consideration of the record, including the evidence produced at the sentencing hearing, the court denies the Government's motion and grants in part, and denies in part, its request to enhance Han's base offense level.

## BACKGROUND

On October 23, 1998, Han entered into a plea agreement with the Government. In exchange for the latter's dismissing four counts of a five count superseding indictment, Han pled guilty to violating 18 U.S.C. § 371 for conspiracy to smuggle aliens. As articulated in the plea agreement, on three separate dates Han conspired with others, including co-defendant Young Ji Chung, to transport illegal aliens into the United States. Han admits that on March 27, 1998, he conspired with Bradley Gauvin and "other persons unknown" to transport three aliens—aliens not entitled to enter or remain in the United States—into this country via the border between northern New York and Canada. Roughly a month and a half later, on May 13, 1998, Han conspired with Chung to smuggle three more illegal aliens into the United States by similar fashion. Finally, Han concedes that on June 10, 1998, also within the Northern District of New York, he conspired "with persons known and unknown" to transport two more illegal aliens into the United States.

Provision 7.1 of the plea agreement, presented under the rubric "Sentencing Stipulations," states that according to U.S.S.G. § 2L1.1(a)(2), Han's base offense level is twelve. The following provision, 7.2, reads:

> It is understood that the stipulation does not address whether the offense level should be increased pursuant to Section 2L1.1(b)(5) based on defendant's conduct at the time of his arrest or what the number of illegal aliens is pursuant to guideline § 2L1.1(b)(2). It is further understood, that the above agreement to stipulate cannot and does not bind the sentencing Court, which may make independent factual findings and reject any or all stipulations presented by the parties. Further, it is understood that this agreement to stipulate on the part of the United States is based on the evidence and information that it possesses as of the date of the Plea Agreement, and is

subject to the proviso that, if the United States obtains or receives additional evidence or information prior to sentencing which it determines to be herein, the United States shall no longer be bound by such stipulation. A subsequent determination that any stipulation is not binding on the Court or the United States shall not be the basis for the withdrawal of a plea of guilty by SUCK HO HAN from any other portion of this Plea Agreement, including any other stipulation agreed to herein. *To the extent this stipulation does not address any factor potentially affecting the Sentencing Guideline range applicable to the defendant, SUCK HO HAN, the United States Attorney's Office expressly reserves its right to advocate, in its sole and unfettered discretion, how any such factor affects the applicable Sentencing Guideline range.* (Emphasis supplied).

Plea Agreement at ¶ 7.2 (dkt.11).

Pursuant to that provision, the Government asks the court: (1) to adopt the United States Probation Department's finding that a nine level offense characteristic adjustment is appropriate under U.S.S.G. § 2L1.1(b)(2)(C) due to Han's smuggling more than 100 aliens; (2) to adopt probation's finding that a two level specific offense characteristic adjustment is appropriate pursuant to § 2L1.1(b)(5) because defendant created a substantial risk of bodily injury or death during his apprehension; (3) to grant its motion for a four level offense adjustment under § 3B1.1(4) because Han was the organizer of an extensive smuggling operation; and (4) to grant its motion for an upward departure under § 2L1.1 because Han smuggled substantially more than 100 aliens. Conversely, Han contends that he smuggled no more than eight aliens, disputes that he created a substantial risk of harm, insists no evidence exists that he organized or lead a criminal operation involving five or more parties, and opposes an upward departure under § 2L1.1.

Following a meeting with the court at which Han, through counsel, objected to probation's suggested enhancements, the parties agreed that the court should hold a sentencing hearing. At the commence of this hearing, however, Han requested that the court order it not be held because it "violate[d] the spirit of the plea agreement." The court reserved decision on Han's motion and continued the hearing. The court now denies Han's motion: the plea agreement, as set forth *infra*, clearly permits the Government to seek the relief it has requested. What follows constitutes the court's findings from the hearing and reflects its reasoning for imposing Han's sentence.

## DISCUSSION

### I. Evidentiary Standards

#### A. Burden of Proof

The Government contends that because the upward departure sought here is not dramatic, the burden of proof it must meet to demonstrate Han's relevant conduct is a preponderance of the evidence standard. *See United States v. Concepcion,* 983 F.2d 369, 388 (2d Cir.1992), *cert. denied,* 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993); *United States v. Rodriguez–Gonzalez,* 899 F.2d 177, 182 (2d Cir.), *cert. denied,* 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990). Han counters the applicable burden is a clear and convincing standard.

In *United States v. Shonubi,* the Second Circuit held that "a more rigorous standard" than preponderance of the evidence "should be used in determining disputed aspects of relevant conduct where such conduct, if proven, will significantly enhance a sentence." 103 F.3d 1085, 1089 (2d Cir.1997) (*citing United States v. Gigante,* 94 F.3d 53, 56–57 (2d Cir.1996) (denying petition for rehearing)). The question here is whether Han's disputed relevant conduct, if proven, would signifi-

cantly enhance his sentence; the answer is that it would not.

Han's base offense level under the guidelines is twelve. Given that he admits to smuggling eight aliens, that number is increased by three. *See* U.S.S.G. § 2L1.1(b)(2)(A). Again, the Government insists Han smuggled more than one hundred aliens, which would add nine to his base offense level. *See* U.S.S.G. § 2L1.1(b)(2)(C). It also seeks a two point enhancement under § 2L1.1(b)(5) and a four point enhancement under § 3B1.1(4). To this sum of twenty-seven, the Government requests an unspecified upward departure under § 2L1.1, fn. 4.[1] The parties agree that Han's criminal history category is one. Under Han's view, the guidelines mandate a sentence of eighteen to twenty-four months; under the Government's view, Han must face a sentence of at least seventy to eighty-seven months. This increase is not the type of significant sentencing enhancement that should lead to application of a higher standard of proof. *See, e.g., United States v. Ruggiero,* 100 F.3d 284, 291 (2d Cir.1996) (increase in sentencing range from range of 27–33 months to 188–200 months did not warrant application of higher standard to determine relevant conduct); *see also United States v. Murgas* 31 F.Supp.2d 245, (N.D.N.Y.1998) (Munson, S.J.) (applying "clear and convincing evidence" standard to relevant conduct determination where additional conduct increased potential sentence to life imprisonment). Accordingly, the applicable burden of proof is a preponderance of the evidence standard.

### B. Evidence the Court May Consider as Relevant Conduct

█ Evidentiary standards at sentencing hearings are less restricted than those applicable during a trial. Title 18 U.S.C. § 3661 authorizes that "[n]o limitation shall be placed on the information concerning the background, character, and con-

duct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Indeed, under U.S.S.G. § 6A1.3:

> [i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indices of reliability to support its probable accuracy.

A sentencing judge may consider hearsay statements, evidence of uncharged crimes, dropped counts of an indictment and even alleged criminal activity resulting in an acquittal in determining sentencing. *See United States v. Pugliese,* 805 F.2d 1117, 1122 (2d Cir.1986). As long as the information which the sentencing judge considers has sufficient indicia of reliability to support its probable accuracy, the information may properly be taken into account in passing sentence. *See United States v. Watts,* 519 U.S. 148, 117 S.Ct. 633, 637, 136 L.Ed.2d 554 (1997).

### II. Aliens Smuggled

█ Han concedes smuggling eight aliens, while the Government contends that the actual number is over one hundred. Essentially, the Government bases its calculation on seven pieces of evidence: (1) Canadian law enforcement reports dating from 1994 to 1998 in which law enforcement personnel repeatedly observed Han in situations conducive to alien smuggling; (2) photocopies of aliens' passports found during the search of a locker belonging to Han; (3) shipping receipts matching names found in these passports that indicate shipments of personnel items made from Canada to addresses within the United States; (4) a sworn statement and out of court testimony from Bradley Gauvin intimating that he Han had smuggled

---

**1.** That footnote suggests that if a smuggling offense involves "substantially more than 100 aliens, an upward departure may be warranted."

aliens approximately eighty times prior to Gauvin's 1998 arrest; (5) testimony from Chung, Han's co-defendant, that he had smuggled approximately twenty-five aliens for Han since 1997; (6) sworn statements from aliens arrested with Chung that indicate a Mr. Park arranged their illegal entry into the United States; and (7) testimony and evidence obtained from aliens arrested with Han, including a passport and a Purolator bill of lading. The testimony of Gauvin and Chung alone demonstrates that Han smuggled more than one hundred aliens.

Young Ji Chung was arrested May 13, 1998 after meeting with intent to transport three illegal aliens in Jacques Cartier State Park near Morristown, New York. The aliens had been transported across the St. Lawrence River by a "Mr. Park," with whom Chung had been smuggling aliens since March 1997, and Chung for a fee was to transport them to New York City. Chung, who subsequently identified Mr. Park as Han, testified credibly that he had transported aliens for Han "about twenty times." Sentencing Hrg. Tr. at 188. In sum, he estimates transporting twenty-five aliens for Han. *See Id.* at 189–90; Govt Ex. 60.

Bradley Gauvin was arrested March 27, 1998 near Morristown, New York while attempting to smuggle three Korean nationals into the United States. A day later, he gave a sworn statement regarding the incident. He conceded in the statement that approximately a week prior to his arrest, he had been called by an individual he knew as "Paul Young" to "help him get some guys across the border to New York." Govt's Ex. 26. Paul Young was really Han: a month later, Gauvin identified Young as Han in a photographic line-up.[2] According to Gauvin, Han's plan was to bring the aliens from Toronto to Brockville, Ontario and transport them by boat across the St. Lawrence River into New York. As the boat approached New York, Gauvin was to head towards the Jacques Cartier State Park and look for flashing headlights, which "was to be the signal for the pick up place." *Id.* Han promised to pay Gauvin "after the job was completed and successful." *Id.*

All went well for a while. Han brought the aliens to Brockville; they loaded on a boat that had been made ready for the crossing; they set off across the river. But, as the Alloway, Ayrshire poet once penned, "The best-laid schemes o' mice and men/ Gang aft a-gley/ And lea'e us nought but grief and pain/ For promised joy."[3] Gauvin thought he was heading in the right direction, but became lost; and while looking for headlights, he dashed the craft against some rocks. Gauvin and the trio of aliens came ashore and the boat "floated away." *Id.* Gauvin told the aliens to walk to the park, while he went to search for a telephone to call Han. Acting on a call from the citizen whose telephone Gauvin had borrowed, law enforcement personnel arrived on scene. After finding Gauvin and his three wandering charges, the investigators soon developed that they had entered the country illegally. Gauvin's arrest followed, as did his sworn statement implicating Han in the affair.

While taking his sworn statement, the agent interrogating Gauvin asked him who owned the boat used in the smuggling attempt. Gauvin responded: "It could be me or him [*i.e.*, Young a/k/a Han], I am unsure. We had two boats before and one was registered in my name and the other in an alias name. One of the boat[s] was junked and the one remaining I am unsure of who's [sic] it is." *Id.* The inference from this testimony, as well as from other evidence such as Han's diary and the Canadian law enforcement reports, is that

---

**2.** Gauvin's identification of Young as Han is corroborated by a entry found in Han's calendar, which was seized during a search. Dated March 27, 1998, the entry stated: "the worst day, Brad caught, boat broke down, confiscated, spent night in car." Govt Exs. 25, 25a.

**3.** Robert Burns, "To a Mouse."

Han and Gauvin had smuggled aliens previously. Moreover, Paul Moran, a Special Agent with the United States Border Patrol, testified at the sentencing hearing that Gauvin confessed to him he had been paid $100 per alien for each of the eighty or more times he smuggled aliens for Han. *See* Sentencing Hrg. Tr. at 255. In his affidavit, Moran noted that Gauvin claimed to have smuggled two people on average per trip, with the largest group of aliens numbering nine. *See* Govt Ex. 28.

Although the Government made it clear that it wished him to appear at the hearing, Gauvin, who resides in Canada, refused to return to the United States and testify. Admittedly his reticence gives the court some pause, and certainly the court would have preferred his testimony in open court; but the Government's burden is simply to show by a preponderance of the evidence—not a greater standard—that Han smuggled more than one hundred aliens. The court is satisfied with the evidence the Government has presented and finds it has met this burden. Han's base offense level is augmented by nine pursuant to U.S.S.G. § 2L1.1(b)(2)(C).

### III. Substantial Risk of Bodily Harm or Death

■ Under § 2L1.1(b)(5) of the Sentencing Guidelines, a defendant faces a two point sentencing enhancement if his offense involved "intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person." According to the commentary to that section, "[r]eckless conduct to which the adjustment from subsection (b)(5) applies involves a wide variety of conduct," including flight from a law enforcement officer. The Government argues, and the court concurs, that there was a substantial risk of bodily injury during the boat chase leading to Han's apprehension. The question, however, is who created the greater risk of

harm: Han or the authorities trying to apprehend him?

According to the Government, just prior to his apprehension Han was under surveillance by various law enforcement personnel, including Senior Border Patrol Agent Glen Bertrand, Jr. Bertrand, who was a Government witness at the sentencing hearing, testified that on June 10, 1998 his office received a telephone call from Canadian authorities warning that Han was about to enter New York with illegal aliens. Bertrand and another agent boarded their eighteen foot Boston Whaler, powered by an 150 horsepower outboard engine, and set out to find Han. They soon found him plodding across the St. Lawrence, nearing Ogdensburg, New York. Two women accompanied Han. As Han's boat approached the Grandview Restaurant near the New York shore, Bertrand and his partner, Agent Skipka, opened the throttle of their patrol boat and broached the distance between the vessels. Although he lost sight of Han's craft as it neared the Grandview Restaurant's docks, Bertrand soon saw two women run from the river banks towards the restaurant. He instructed his partner to turn on their boat's flashing blue emergency lights and siren.

As they neared the docks, Han's craft reappeared. Skipka waved his arms and yelled to Han that he must stop. Although he was only fifty yards away, Han ignored Skipka, opened his throttle, and turned towards Canada. The agents gave chase. Han's boat, a fourteen foot fiberglass craft powered by a thirty-five horsepower outboard engine, was no match for the agents' much faster Whaler.[4] As they neared Han's craft, Skipka again motioned for Han to stop. Instead, Han did his best to maneuver around the pursuing vessel, with the apparent intent of reaching Canadian waters. At one point, their boats bumped together. Han turned his boat

---

4. Indeed, Agent Bertrand testified that at full throttle, his patrol boat made thirty-eight to    forty miles per hour.

away, while the Bertrand, who was driving the Whaler, countered Han's moves. During these maneuvers, Han rammed into the port side stern of the Whaler. Han then slowed his craft considerably and the agents followed suit. After Skipka attempted to grab Han's boat and missed, Bertrand jumped into it.

Bertrand landed near the stern of Han's boat. He quickly moved forward, grabbed the ignition keys, shut off the engine, and tossed the keys into his patrol boat. As he did this, Han spun and arose out of his seat, threw his head into Bertrand's stomach, put his arms around Bertrand's waist, and pushed him back towards the transom. Bertrand, who was not wearing a life vest, spread his legs to counter Han's action and told Han he was under arrest. As he yelled to Skipka for assistance, Bertrand grabbed Han and squeezed him hard. Han backed off. Bertrand attempted to handcuff him and a struggle ensued, during which Han grabbed several times at his ankles. Concerned that Han might be reaching for a weapon, Bertrand held him down and searched him for a weapon, but did not find one. Han, meanwhile, extricated himself and he continued to struggle. Eventually, Skipka managed to secure one handcuff on Han and the other to the vessel's steering wheel. Skipka then applied a second set of handcuffs to Han.

At about that time, Skipka yelled to Bertrand that Han's boat was taking on water. The agents unhandcuffed Han from the steering wheel and transferred him to the patrol boat. Bertrand tied a line from that boat to Han's and headed with it in tow to the Grandview Restaurant's docks. Although Han's craft managed to make it to the dock, once there it sank. Han was arrested and Bertrand filed both a report of the assault and a separate memorandum of the incident. *See* Govt's Exs. 61, 62.

Yet, under cross-examination, Bertrand offered some intriguing responses. First, as much as Han wished to escape to Canada, it is clear to the court that the agents wanted to apprehend him before he made it there. As Bertrand acknowledged, if they were to arrest Han, they had to do it in American waters because he "had no plans to have the Canadians arrest him." Sentencing Hrg. Tr. at 39. Second, in his memorandum, Bertrand acknowledged that Han's boat sustained damage in its sides below the watermark, which ultimately caused it to sink. *See* Govt's Ex. 62. Given this type of damage, the considerable size and horsepower differential between Han's craft and the patrol boat, and that Bertrand and Skipka were eager to detain Han before he made his way to Canada, the evidence suggests that at some point it was Han's boat that was rammed. Moreover, defense counsel elicited some testimony that during his struggle with Han, Bertrand struck him in the face. *See* Sentencing Hrg. Tr. at 53–54. Han contends that this conduct—and not his—presented the real substantial risk of serious bodily injury.

While the court would not characterize Han's position as specious, it does find his argument misguided. First, Han never countered the Government's evidence that he was attempting to evade arrest. Certainly fleeing from the agents across the river—especially while engaging in evasive maneuvers—presents some risk of bodily harm. Second, Bertrand, who was a credible witness, never wavered in his testimony that Han attempted to push him off the transom of his boat. Bertrand was not wearing a life vest: if Han pushed him overboard, he may have been seriously injured or may have drowned. The agents' actions may have exacerbated the risk that someone would be harmed, but they merely were reacting to a situation created by Han. The Government's request is granted and Han's base offense level is augmented by two pursuant to U.S.S.G. § 2L1.1(b)(5).

## IV. Organizer or Leader of a Criminal Activity

The Government asks for a four level offense adjustment to Han's sentence

under § 3B1.1(4) because it contends Han was the organizer of an extensive smuggling operation. Under that section of the guidelines, a defendant's offense level is enhanced four levels if he was "the organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." *Id.* According to the Government's theory, Han managed a smuggling operation that included Gauvin, Chung, "Miss Park," Euy Yong Yang and "individuals in Korea and alien 'brokers' in New York City." Govt Summary Argument at 10.

Certainly evidence exists that Han participated in the smuggling of more than one hundred aliens into the United States. The record, however, is unclear as to the extent of his participation in the smuggling as compared to the other participants: *e.g.,* to what degree did the unnamed alien brokers or even Gauvin participate in organizing the smuggling? Were they any more or less responsible than Han for perpetrating the smuggling? Given that the record is unclear on this issue, the court does not find the enhancement under U.S.S.G. § 3B1.1(4) is warranted. The Government's instant request is denied.

### V. Upward Departure

■ The Government notes that the sentencing guidelines suggest that if an offense involved smuggling substantially more than one hundred aliens, "an upward departure may be warranted." U.S.S.G. § 2L1.1, n. 4. After consideration of the record, much of which is addressed *infra,* the court does not find that an upward departure is appropriate. The Government's instant request is denied.

### CONCLUSION

After careful consideration, the court **GRANTS** the Government's request for a nine level offense characteristic adjustment under U.S.S.G. § 2L1.1(b)(2)(C); **GRANTS** the Government's request for a two level specific offense characteristic adjustment under § 2L1.1(b)(5); (3) **DE-**

**NIES** the Government's request for a four level offense adjustment under § 3B1.1(4); and **DENIES** the Government's motion for an upward departure under § 2L1.1. The sum of Han's base offense level, which is twelve, and the offense level enhancements, which total eleven, is twenty-three. The United States Marshals Service is directed to produce Han for sentencing on November 12, 1999 at 2:00 pm at the Federal Courthouse in Syracuse, New York. **IT IS SO ORDERED.**